1  LAW OFFICES OF STEVEN ROOD
   Steven Rood (Cal. Bar No. 69332)
2  E-mail: steve@steverood.com
   405 – 14th Street, Ste. 212
3  Oakland, CA 94612
   Telephone:  510-839-0900
4  Facsimile:  510-839-0230

5  ISAACSON &WILSON, P.S.
   Mark J. Wilson (Cal. Bar No. 96985)
6  Email:  mjwilson@isaacsonwilson.com
   1200 5th Avenue, Ste. 1900
7  Seattle, WA 98101
   Telephone:  206-448-1011
8  Facsimile:  206-448-1022

9  *Attorneys for Plaintiffs*

10

11                UNITED STATES DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13

14  GREGORY R. RAIFMAN and SUSAN              Case No.: No. C 11-02885 SBA
    RAIFMAN, husband and wife, individually
15  and on behalf of their marital community   **PLAINTIFFS' REPLY MEMORANDUM**
    and as Trustees of the RAIFMAN FAMILY     **IN SUPPORT OF MOTION FOR**
16  REVOCABLE INTERVIVOS TRUST and            **LEAVE TO FILE PROPOSED**
    as beneficiaries of the PALLADIAN         **AMENDED COMPLAINT**
17  TRUST; GEKKO HOLDINGS, LLC, and
    HELICON INVESTMENTS, LTD,                 **HEARING**
18
                Plaintiffs,                    Date:      December 6, 2011
19                                             Time:      1:00 pm
          vs.                                  Ctrm:      1
20                                             Judge:     Hon. Sandra B. Armstrong
    WACHOVIA SECURITIES, LLC, N/K/A
21  WELLS FARGO ADVISORS LLC;
    GEORGE GORDON, III, individually; and
22  ROBERT EDDY, individually,

23                Defendants.

24

25

26

27

28

---

# TABLE OF CONTENTS

1.  Introduction. . . . . . . . . . . . . . . . . . . . .. . . . .. . . . . . . . . . . . . . . . . . . . . . . .1

2.  Legal Standard Regarding Leave to Amend. . . . . . . . . . . . . . . . . . . . . . . . .5

3.  Defendants are not prejudiced by the Proposed Amended Complaint. . . . . . . 6

4.  Plaintiffs are not guilty of undue delay in moving to amend. . . . . . . . . . . . . .6

5.  The Proposed Amended Complaint is not futile. . . . . . . . . . . . . . . . . . . . . . . .7

6.  Joinder of Wachovia Bank as a Defendant is proper. . . . . . . . . . . . . . . . . . . . 13

7.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
LEAVE TO FILE PROPOSED AMENDED COMPLAINT
Case No. C 11-02885 SBA

1

2                           **TABLE OF AUTHORITIES**

3

4   **Cases**

5   *Bogart v. Nat'l Cmty. Banks, Inc.*, 1992 U.S. Dist. LEXIS 14958 at *8 (D.N.J. Apr. 25, 1992) ...............3

6   *Calloway v. Commissioner*, 135 T.C. 26 (2010) ...................................................................................4

    *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183,185 (9th Cir. 1987) .........................................................6

7   *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003)..................................3

8   *Eminence Capital, LLC v. Aspeon*, 316 F.3d 1048, 1051 (9th Cir. 2003)....................................................5

    *Foman v. Davis*, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962) ......................................,.........5

9   *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985 (C.D. Cal. 2008); ......................................3

10  *General Holding, Inc., v. Charles Cathcart, et. al.*, (Civil Action No. 2:06-cv-01121 ..............................4

    *Gonzalez v. LloydsCapital TSB Bank, PLC*, 532 F.Supp.2d 1200, 1207 (C.D. Cal. 2006 ........................2

11  *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973)....................................................................6

12  *Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal. App. 3d 1220, 1249-1250 (Cal. App.

        2d Dist. 1991)..........................................................................................................................................13

13  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...........................................................................9

14  *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) ...................................6

    *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997)..........................................................6

15  *Neilson*, 290 F.Supp.2d at 1120; Fed R. Civ. Proc. 9(b); ...........................................................................2

16  *Smith v. Network Equip. Techs., Inc.*, 1990 U.S. Dist. LEXIS 18391 (N.D. Cal. Oct. 19, 1990). ...............3

17  *Sollberger v. Wachovia Securities, LLC*, 2010 U.S. Dist. LEXIS 66233 (2010)..............................8, 9, 13

    *Tran v. Farmers Group, Inc.*, 104 Cal. App. 4th 1202, 1210, 128 Cal. Rptr. 2d 728 (2002).....................13

18  *Uccello v. Laudenslayer*, 44 Cal. App. 3d 504, 514, fn. 4 (1975)..............................................................2

19

20

21

22

23

24

25

26

27

28

1        Plaintiffs respectfully submit the following Reply Memorandum, Declaration of Gregory

2   Raifman and Second Declaration of Mark J. Wilson in Support of Plaintiffs' Motion for Leave to

3   File Plaintiffs' First Amended Complaint, filed concurrently herewith.

4   **1. Introduction**

5        The purpose of the original complaint (OC) and the proposed first amended complaint

6   (PAC), is to allege the Defendants' knowledge, participation, promotion and aid and abettance in

7   Derivium's fraudulent 90% Stock Loan Program ("Program"). (See, generally, Dkt. 1, OC; and

8   Dkt. 37-1, PAC). Wachovia actively marketed and promoted the Program. Despite Defendants'

9   claims that both pleadings are a "jumbled mess" (Dkt. 38, Defs' Opp Memo, p. 5), both

10  complaints are sufficient to put the Defendants on notice of the claims alleged against them.

11       Wachovia uses its opposition to the motion for leave to file the PAC to throw up a smoke

12  screen to the numerous allegations in the PAC that raise a strong inference that Wachovia knew

13  about the fraudulent nature of the 90% Stock Loan, helped implement it and actively marketed

14  the Program. It is incredible that Wachovia argues it is implausible that Wachovia had actual

15  knowledge of the fraud.

16       The May 21, 1998 letter from Charles Cathcart to George Gordon is not the core of the

17  PAC, as Wachovia argues—in fact, it is only tip of the iceberg. The Cathcart letter letter is only

18  one piece of evidence that gives rise to a strong inference that Wachovia had actual knowledge

19  of Derivium's fraud and promoted and helped Derivium implement the fraud.

20       The PAC alleges that Wachovia, Gordon and Eddy helped the Derivium principals and

21  their alter-ego entities design, promote and implement the Derivium 90% Stock Loan so they

22  could continue making commissions on the illegal sales. (PAC, ¶14).

23       There is evidence that Wachovia promoted the Derivium 90% Stock Loan through

24  Wachovia's Loftus Group. Attached as Exhibit 4 to the Second Wilson Decl. is a copy of the

25  marketing and promotional materials dated March 4, 2004, prepared by The Loftus Group of

26  Wachovia Securities regarding the Derivium 90% Stock Loan. These materials were provided by

27  Wachovia's Loftus Group to other prospective Derivium 90% Stock Loan borrowers. The

28  Loftus Group promotional material regarding the Program is evidence that Wachovia was in fact

1  marketing and promoting the Derivium 90% Stock Loan.  It can be strongly inferred, therefore,

2  that Wachovia reviewed Derivium's marketing material in order to familiarize itself enough with

3  the Program to recommend it to prospective Borrowers.

4       George Gordon was the broker on all of the Derivium accounts since he was at Wheat

5  First Union in 1998 and he continued in that capacity after Wheat First Union merged with

6  Wachovia in 2001.  The May 21, 1998 letter served to inform Gordon that the securities coming

7  into the Derivium account would consist of pledged collateral that belonged to Borrowers, which

8  Derivium was to hedge with puts and calls. Going forward from May 1998, Gordon could

9  plainly see that the actual activity in the Derivium account did not consist of any hedging, only

10  immediate sales of the collateral.  (PAC, ¶40).  Gordon did not need to review the Derivium

11  marketing material to know that Derivium was acting contrary to the representations made in its

12  May 21, 1998 letter.

13       Walter Anderson was manager of the same Wachovia Securities Branch as Gordon where

14  all of the Derivium accounts were located. (PAC, ¶43).  Walter Anderson is the father of

15  Randolph Anderson, who held the senior position of Account Executive for Derivium.  (PAC,

16  ¶44).  Walter Anderson himself participated as a Borrower in two 90% Stock Loans in 1998 and

17  2000. (PAC, ¶45).  Derivium used Walter Anderson as a reference contact in its marketing

18  materials. (PAC, ¶46).

19       Many of Wachovia's own customers, including the Raifmans, participated in the

20  Program, because Wachovia failed to inform them that a diversion of their assets was intended .

21  (PAC, ¶¶32, 33).

22       All of these facts raise a strong inference that Wachovia was familiar enough with the

23  Program and the activity in Derivium's account to know that the representations by Derivium to

24  its Borrowers that it would hedge the securities before funding the loan were false. (PAC, ¶¶36-

25  58).

26       Actual knowledge may be shown, not only by direct evidence, but also by circumstantial

27  evidence. *Uccello v. Laudenslayer*, 44 Cal. App. 3d 504, 514, fn. 4 (1975). Courts have found

28  that it is sufficient to plead actual knowledge generally. *Neilson*, 290 F.Supp.2d at 1120; Fed R.

Civ. Proc. 9(b); *see also Gonzalez v. LloydsCapital TSB Bank, PLC*, 532 F.Supp.2d 1200, 1207 (C.D. Cal. 2006) (holding that Plaintiff's allegations concerning Defendant's bank's knowledge of Ponzi scheme adequately pled knowledge requirement); *abrogated on other grounds by Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985 (C.D. Cal. 2008); *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003) (holding that a complaint asserting that "'Citibank, through its officers and employees, . . . actually knew of and participated in the unlawful scheme to steal from DIB and launder the money stolen from DIB' . . . sufficiently alleged that Citibank had actual knowledge"); *Bogart v. Nat'l Cmty. Banks, Inc.*, 1992 U.S. Dist. LEXIS 14958 at *8 (D.N.J. Apr. 25, 1992) (holding that plaintiff had adequately pleaded the actual knowledge element of an aiding and abetting claim because "Rule 9(b) clearly provides that 'intent, knowledge, and other condition of mind of a person may be averred generally.' . . . Rule 9(b) is satisfied where plaintiff 'alleges generally that defendants had actual knowledge of the materially false and misleading statements and omissions . . . or acted with reckless disregard for the truth.' . . . Plaintiff has met this standard"); *Smith v. Network Equip. Techs., Inc.*, 1990 U.S. Dist. LEXIS 18391 (N.D. Cal. Oct. 19, 1990). In this case, as discussed above, there is more than sufficient evidence to support Plaintiff's allegation that Defendants had actual knowledge of the Derivium fraud.

The primary objective of Program, pure and simple, was to steal 10% of the value of other peoples' stock, including the Raifmans.

The Derivium Principals ("Principals") accomplished their objective through a combination of lies and concealment, but, most importantly, with the knowledge and help of Wachovia.

Derivium tricked Borrowers into transferring their securities into Derivium's brokerage account by falsely claiming in their marketing materials that they would not sell the securities, but would hedge them and would then "loan" the Borrower 90% of the "hedged value." Derivium misrepresented in its Master Loan and Financing Agreement that it would not sell the Borrowers' securities before the Loan Term. (PAC, ¶¶10-20, 25; Declaration of Gregory Raifman ("Raifman Decl."), ¶¶2-17).

1       Derivium never intended to hedge its Borrowers securities or even make a loan. Instead,

2   the Derivium Principals immediately sold the securities before any purported "Loan Term"

3   without the Borrowers' knowledge or permission, gave the Borrower 90% of the sale proceeds,

4   claiming it was loan proceeds, took the remaining 10%, commingled it with the proceeds of

5   other unauthorized sales and kept it for themselves. (PAC, ¶¶10-20, 25; Raifman Decl., ¶¶19-20).

6       Derivium concealed its theft by concealing from its Borrowers that it had immediately

7   sold their securities upon transfer into Derivium's account.  (PAC, ¶¶25-26).  Derivium

8   continued its deception by falsely claiming to its Borrowers that the money it gave to them was

9   loan proceeds and it concealed the fact that the money was from the proceeds of the sale of the

10  Borrowers' own stock.  Derivium continued its fraud by sending out quarterly account

11  statements to its Borrowers intended to create the false impression that Derivium continued to

12  hold the securities as collateral when, in fact, the securities had been sold before the purported

13  Loan Term even began, in violation of the loan agreement. (PAC, ¶¶25-26).

14      Derivium's fraudulent 90% Stock Loan is described by Judge Norton in *General*

15  *Holding, Inc., v. Charles Cathcart, et. al.,* (Civil Action No. 2:06-cv-01121, Dkt. 543), filed in

16  the  U.S. District Court for the District of South Carolina as  "a fraudulent lending scheme,

17  designed and perpetrated by Charles Cathcart and Yuri Debevc (the "Principals"), among others,

18  to use other people's money to finance their own venture capital projects. Judge Norton's

19  Findings of Fact and Conclusions of Law detailing the fraudulent 90% Stock Loan is referenced

20  in the OC at ¶2, fns. 1 and 2, a copy of which is attached hereto as Exhibit 1 to the Second

21  Declaration of Mark J. Wilson in Support of Motion for Leave to File First Amended Complaint

22  ("Supp. Wilson Decl."), filed concurrently herewith.

23      The objective to steal 10% of the value of other peoples' stock was made clear by Judge

24  Holmes in the case of *Calloway v. Commissioner*, 135 T.C. 26 (2010):

25              Derivium's promises of a secret hedging strategy and its continual flow of

26              false statements to its customers, *suggest to any reasonable observer in*

                *hindsight that its intent was not to make either a loan or a sale, but a*

27              *quick theft of 10 percent of the stock's value.*

28  *Calloway v. Comm'r*, 135 T.C. at 68 (emphasis added).

---

4

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
LEAVE TO FILE PROPOSED AMENDED COMPLAINT
Case No. C 11-02885 SBA

Wachovia did not need the benefit of hindsight to learn of Derivium's theft. Wachovia was able to see the entire fraudulent first-hand, as it happened. (PAC, ¶¶27-59). Not only that, Wachovia aided and abetted Derivium to implement the fraud every step along the way and even marketed the Program for Derivium: Wachovia marketed the Derivium 90% Stock Loan through Wachovia's Loftus Group (PAC, ¶14; Second Wilson Decl., Exhibit 4); Wachovia Securities knew that Derivium represented to prospective borrowers that it would hedge the pledged collateral before funding the loan; received the initial transfer of securities into Derivium's account, knowing they were securities in which Derivium's Borrowers owned a beneficial interest; Wachovia Securities executed the immediate sale of those securities, knowing they were unauthorized sales and that Derivium did not engage in any hedging transactions; Wachovia Securities transferred the proceeds of the sales to the Principals' accounts at Wachovia Bank and Wachovia Bank knew the proceeds came from the unauthorized sale of the Borrowers' stock; Wachovia Bank wired 90% of the sale proceeds to the Borrowers, knowing that the proceeds were from the unauthorized sale of the Borrowers' own stock and that Derivium falsely represented that the funds were loan proceeds instead of the sale proceeds of the Borrowers' own stock; and Wachovia Bank transferred the remainder of the sale proceeds to the Principals' accounts at Wachovia Bank, knowing that the funds were being commingled and used by the Principals for their own benefit. (PAC, ¶¶27-59; Raifman Decl., ¶¶16-20).

## 2.   Legal Standard Regarding Leave to Amend

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon*, 316 F.3d 1048, 1051 (9th Cir. 2003). The Supreme Court has set forth several factors that a district court should evaluate in determining whether justice requires granting leave to amend, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Id.* at 1052 (quoting *Foman v. Davis*, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)).

Not all of the factors in determining whether a plaintiff should be granted leave to amend the complaint merit equal weight. As this circuit and others have held, it is the consideration of prejudice to the opposing party that carries the greatest weight. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. Cal. 2003), citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183,185 (9th Cir. 1987). Prejudice is the "touchstone of the inquiry under rule 15(a)." *Id.*, citing *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); and *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973) (stating that "the crucial factor is the resulting prejudice to the opposing party"); cf. *DCD Programs*, 833 F.2d at 186-87 (noting that party opposing amendment "bears the burden of showing prejudice"). Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend. *Eminence Capital,* 316 F.3d at 1052, citing *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997).

### 3. Defendants are not prejudiced by the Proposed Amended Complaint.

Defendants do not allege prejudice and none of the grounds advanced by Defendants for opposing the PAC amount to prejudice. Defendants argue that the PAC is "legally deficient" in that the "Cathcart Letter" purportedly does not support Plaintiffs' amended claims (Defs' Opp Memo, p. 3); that the PAC is "impermissible shot gun pleading" (*Id.*, at p. 5); that the PAC is barred by the statute of limitations (*Id.*, at p. 6); that the facts were known by Plaintiffs when the original complaint was filed (*Id.*, at p. 7); that the PAC is futile (Id., at p. 8); and that adding Wells Fargo Bank is untimely, futile and sought to defeat diversity (*Id.*, at p. 10). Plaintiffs dispute each of these allegations. More to the point is that none of these arguments satisfy Defendants' burden to show that they would be prejudiced by the PAC.

### 4. Plaintiffs are not guilty of undue delay in moving to amend.

There have been no amendments to the original complaint, filed on April 1, 2011 in Superior Court of California, Alameda County and removed to this Court by Defendants on June 13, 2011. (Dkt. 1). The present motion for leave to amend is the first time Plaintiffs have moved to amend. Defendants' claim that the Proposed First Amended Complaint (PAC) is Plaintiffs'

1  "third attempt" and "third bite at the apple" and "third try" is incorrect. Defendants'

2  Memorandum in Opposition ("Defs' Opp Memo"), pp.1, 2, 3 and 5.  The original complaint is

3  still the operative complaint.  The Court has yet to rule on its sufficiency or on Defendants'

4  pending motion to dismiss the original complaint.  (Dkt. 12).

5      Defendants want the Court to count the draft proposed complaint that was attached as an

6  Exhibit to the declaration of Mark Wilson in opposition to Defendants' motion to dismiss as

7  Plaintiff as though it were strike two in a baseball game.  However, Plaintiffs made it clear in

8  their memorandum in opposition to the motion to dismiss that it was only a draft and they

9  intended to file a formal motion to amend to be heard at the same time as the motion to dismiss,

10 but could not get on the Court's calendar for the same day as the motion to dismiss. (Dkt. 24,

11 Pltfs' Memo in Opp., p. 1; Dkt. 26, Wilson Decl., and Dkt.26-1, Ex. 1 to Wilson Decl., Draft

12 Proposed First Amended Complaint).  Plaintiffs then filed an Administrative Motion for leave to

13 note their motion to amend for the same date as Defendants' motion to dismiss, as Plaintiffs

14 represented to the Court they would do, which the Court granted. (Dkts. 28 and 32).  Plaintiffs

15 then filed the present motion to amend and proposed First Amended Complaint, which is the first

16 and only motion to amend Plaintiffs have filed in this case. (Dkts.  36 and 37).

17     **5.  The Proposed Amended Complaint is not futile.**

18     The PAC raises strong inferences that Wachovia had actual knowledge of Derivium's

19 fraudulent scheme and that it was aiding and abetting the fraud and participating in the fraud

20 itself by selling the Borrowers' collateral as soon as it was transferred into Derivium's account at

21 Wachovia. (PAC, ¶¶36-58).

22     In the Wachovia's opposition to Plaintiffs' Motion for leave at Note 2, Wachovia's

23 attorneys make the bald assertion, "Defendant's are unaware, and have never known, of any

24 Wheat First Bank."  Wachovia's defense is to deny any knowledge.   But by conducting a simple

25 search on Google using the keywords Wachovia and Wheat First, Plaintiffs were able to locate a

26 description of the history of Wheat First Union Bank.  (Second Wilson Decl., Exhibit 7). The

27 search revealed the following statement which contradicts Wachovia's statement at note 2:

28

One of the main Wachovia Securities' predecessor companies was founded in 1934 as the investment firm of J.C. Wheat & Co. Wheat fostered growth through mergers, including the 1971 merger with First Securities that created Wheat First Securities, Inc. and the 1988 merger with Butcher & Singer, a successful Philadelphia-based securities firm established in 1910; the firm then became known as Wheat first Butcher Singer. In August 1997, the privately held Wheat First Butcher Singer agreed to be acquired for just under $500 million by the Charlotte, North Carolina based First Union Bank. The brokerage firm changed its name to Wheat First Union, reflecting its newly acquired status.

The PAC at ¶7 alleges that Wells Fargo Bank is also the successor in interest to Wheat First Union Bank (Wheat First Union as the result of a merger between Wachovia Bank Corporation and First Union Corporation on April 16, 2001).

In the Gordon Decl., ¶4, page 13, Gordon admits to being entitled to a commission on the funds received from the sale of the Raifman's securities that Gordon transferred to Wachovia Bank.

Wachovia Securities may receive fees and compensation of up to one percent (1.5% of the average monthly deposit balances in the Bank Deposit Account (computed on an annualized basis) from Wachovia Corporation.

Wachovia omits to point out that in *Sollberger v. Wachovia Securities, LLC*, 2010 U.S. Dist. LEXIS 66233 (2010), the Court allowed the Plaintiffs leave to amend their negligence claims against Wachovia Securities and Wachovia Bank. Id. at *29-32. As to Wachovia Securities, the Court stated:

At this point, the Court finds that Plaintiff's negligence claim based on duties reflected in stock exchange rules might possibly be cured through amendment.

Based on the facts identified by Plaintiff, Plaintiff might be able to sufficiently allege that Defendants had and breached a duty of conduct informed by rules such as NYSE Rule 405. According to Plaintiff, Optech was a Hong Kong corporation and transactions were made with an Isle of Mann corporation, which should have raised red flags to Defendants. (SAC PP 62, 65, 73, 86-87.) Further, Plaintiff asserts, Defendants were involved with a large volume of Derivium transactions, (SAC PP 63, 65, 69, 80), and Defendants should have recognized that Derivium was not engaging in hedging transactions as it was supposed to do with the 90% loans, (SAC PP 63-64, 72, 81-82). Plaintiff might be able to use these facts to craft a viable negligence claim.

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
LEAVE TO FILE PROPOSED AMENDED COMPLAINT
Case No. C 11-02885 SBA

The Raifman's Proposed First Amended Complaint ¶133-160 does craft a viable negligence claim against Wachovia Securities based upon duties under NYSE Rule 405 and 342, NASD Rules 2210, 3010, and 342, California Securities Regulations, the Money Laundering Abatement Act, and the Patriot Act.

In *Sollberger v. Wachovia Securities*, LLC, 2010 U.S. Dist. LEXIS 66233 (2010), the Court allowed the Plaintiffs leave to amend their negligence claims against Wachovia Bank. *Id.* at *31-32.

Before concluding, the Court pauses to note that the SAC purports to add Wachovia Bank, N.A. as a Defendant. "Absent extraordinary and specific facts," banks do "not owe a duty of care to a noncustomer" in their financial transactions. *Software Design*, 49 Cal. App. 4th at 479. At oral argument, Plaintiff argued that most Defendants are not banks, and thus Plaintiff does not have to meet the extraordinary circumstances test of Software Design. But this test would apply to Wachovia Bank, N.A. if Plaintiff attempts to assert a negligence claim against it.

In *Software Design*, 49 Cal. App. 4th at 479 the Court articulated the test as follows:

> Our Supreme Court first reiterated the competing policy considerations that come into play when deciding to impose a duty to exercise reasonable care under a given set of circumstances. These include " '. . . the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved." (*Sun 'n Sand, Inc. v. United California Bank*, supra, 21 Cal. 3d at p. 695, quoting *Rowland v. Christian* (1968) 69 Cal. 2d 108, 113 [70 Cal. Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

In *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) the Second Circuit stated that a bank may be liable for participating in a diversion by knowledge that a diversion is intended or being executed. The Court stated:

> [A] bank may be liable for participation in [such a] diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." *In re Knox*, 64 N.Y.2d 434, 438,

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
LEAVE TO FILE PROPOSED AMENDED COMPLAINT
Case No. C 11-02885 SBA

477 N.E.2d 448, 451, 488 N.Y.S.2d 146, 149 (1985). "Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly." *Bischoff*, 218 N.Y. at 113, 112 N.E.2d at 761. "Having such knowledge, [the bank is] under the duty to make reasonable inquiry and endeavor to prevent a diversion." Id. at 114, 112 N.E.2d at 761; see also *Norwest Mortgage*, 280 A.D.2d at 654, 721 N.Y.S.2d at 95 ("Facts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger [such] a duty of inquiry on the part of a depositary bank, and the bank's failure to conduct a reasonable inquiry when the obligation arises will result in the bank being charged with such knowledge as inquiry would have disclosed.").

The PAC satisfies the pleading standard required to assert a negligence claim against a bank. *Software Design*, 49 Cal. App. 4th at 479.   The PAC alleges that Wachovia Securities and Wachovia Bank participated in the diversion of the Raifman's assets.  The failure of Wachovia Bank and Wachovia Securities to exercise reasonable care to stop the diversion of assets caused foreseeable harm to the Raifmans.

The May 21, 1998 letter indicates that Wachovia Bank Wachovia Bank had notice of the red flags which should have raised a suspicion that a diversion was intended by Gordon . (PAC, ¶177).

The PAC alleges that the Witco and Optech shell accounts are defined as private banking accounts, an account with numerous underlying undisclosed investors. Pursuant to the Money Laundering Abatement Act, Wachovia Securities was responsible for knowing who the underlying investors were and researching the source of the underlying assets. (PAC, ¶168).

Pursuant to the Money Laundering Abatement Act, Wachovia was responsible for knowing who the underlying investors were and researching the source of the underlying assets. (PAC, ¶169). A reasonable inquiry into the source of the underlying assets would have placed Wachovia Bank on notice that a diversion of the Raifmans' assets was being executed by Gordon and Wachovia Securities.

The PAC alleges the red flags that should have raised a suspicion that a diversion was intended by Gordon:

The May 21, 1998 letter from Cathcart to Gordon instructs Gordon not to inform Wheat First Securities, or Wheat First Bank or the prospective borrower of the true nature of the

hedging strategy. This letter indicates that the Cathcart was requesting that the transaction be processed in such a manner to avoid the firm's normal documentation requirements. (PAC, ¶169).

The owners of the Optech Accounts were located in Hong Kong, which is a financial secrecy haven. (PAC, ¶169).

The 90% stock loan and hedging strategy were a sham because there was no lender and no hedging strategy. (PAC, ¶169).

The prospective borrower's shares were sold immediately without their knowledge or consent. (PAC, ¶169).

The source of the wire transfers from Wachovia Securities to Wachovia Bank was the sale proceeds of securities which were not owned by Witco or Optech. (PAC, ¶169).

The wire transfer from Wachovia Securities to Wachovia Bank involved the diversion of cash from the Raifman's, who were the true owners. (PAC, ¶169).

The May 21, 1998 letter indicates that the Customers, Optech and Witco, demonstrated unusual concern regarding the firm's compliance with government reporting requirements and the firm's AML policies, particularly with respect to information concerning business activities (hedging strategy). (PAC, ¶169).

Wachovia Securities had no authority to transfer the sale proceeds of the Raifinan's securities to Wachovia Bank. (PAC, ¶169).

Once Wachovia Bank had notice of the red flags which should have raised a suspicion that a diversion was intended by Gordon, Wachovia Bank had a duty to verify whether Wachovia Securities had performed its due diligence in a satisfactory manner. Had Wachovia Bank confirmed whether Wachovia Securities had adequately performed their due diligence, the diversion of the Raifinan's assets should have come to light. Wachovia Bank could have prevented the fraud by closing the accounts of Witco and Optech. (PAC, ¶170).

Absent further due diligence by Wachovia Bank, it was foreseeable that the Raifinan's would suffer harm. (PAC, ¶171).The Witco and Optech accounts at Wachovia Bank were set up for the purpose of receiving cash from the sale of securities owned by participants in the 90%

1  stock loan program. Once the cash was received into the accounts at Wachovia Securities, then

2  Wachovia Bank would have observed that Witco and Optech wired out the proceeds which were

3  transferred into the account within days. The wire transfer to Wachovia Bank was the act which

4  completed the diversion of the Raifinan's assets. Once the Raifinan's securities were converted to

5  cash and wired to Wachovia Bank, then it would become difficult, if not impossible for the

6  Raifinan's to trace their funds. (PAC, ¶171).

7          Wachovia Securities did finally close the Accounts of Witco and Optech in 2005, which

8  was after the Raifmans had already participated in the Program and were damaged. If Wachovia

9  Bank had adequate supervisory procedures in place, they would have and should have closed

10 these accounts of Witco and Optech earlier. (PAC, ¶172).

11         Wachovia Bank acted negligently by failing to look into the source of the funds contained

12 in the underlying account funds as required under Section 312 of the Patriot Act. This would

13 include requiring agreements and backup documentation to verify where the securities were

14 coming from and what the securities were being delivered for. Again, Wachovia Bank would

15 have been aware of the 90% Loan Program and the various conditions and requirements of not

16 being able to sell the securities, transfer the assets out of the name of the underlying clients, the

17 borrowers, and wire cash out of the Wachovia Securities in the name of Witco or Optech. (PAC,

18 ¶173).

19         Had Wachovia Bank conducted their reviews and due diligence pursuant to the Patriot

20 Act Section 312, they would have recognized that the source of funds being attempted to be

21 wired from Wachovia Securities were stolen assets and were transferred to accounts in the name

22 of Witco and Optech in violation of FINRA and NYSE regulations.  (PAC, ¶174). If Wachovia

23 Bank had verified Under the source of funds and traced the ownership of the funds, Wachovia

24 Bank  would have been made aware that the underlying investor securities were not allowed to

25 be sold or assets converted out of their ownership and into the name of Derivium or Witco.

26 Wachovia would have discovered that the moment those sales occurred and the cash was placed

27 into the account of Witco in the name of Witco, the Raifman's and other prospective borrowers

28 became the victim of a theft. (PAC, ¶174).

### 6.  Joinder of Wachovia Bank as a Defendant is proper.

In *Sollberger v. Wachovia Securities, LLC*, 2010 U.S. Dist. LEXIS 66233 (2010), Wachovia Securities argued that it should not be joined as a defendant with Wachovia Bank because Wachovia Bank was the primary Wachovia entity involved in Plaintiff's transaction.  In this case, by comparison, Wachovia Bank argues that it should not be joined because Wachovia Securities was the primary Wachovia entity involved in Plaintiff's transaction.

In the Raifman's case, Wachovia Bank should not be dismissed because Wachovia Securities and Wachovia Bank were acting jointly in a single enterprise regarding the Derivium scheme, and as such should be held to share in liability arising thereby.  As the Court in Las Palmas Associates stated, "it would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity." *Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal. App. 3d 1220, 1249-1250 (Cal. App. 2d Dist. 1991).  In order for two related corporations to be held liable through a single enterprise, there must be (1) a unity of ownership and a single enterprise, and (2) that inequity would result if the corporations are treated separately. *Tran v. Farmers Group, Inc.*, 104 Cal. App. 4th 1202, 1210, 128 Cal. Rptr. 2d 728 (2002); *Hamilton Beach Brands, Inc. v. Metric & Inch Tools, Inc.*, 614 F. Supp. 2d 1080, 1083 (D. Cal. 2009).  Whether these conditions have been satisfied is a question of fact. *Las Palmas Associates*, 235 Cal. App. 3d at 1248.

First, Wachovia Bank and Wachovia Securities shared common ownership because they are sister corporations both owned by the parent Wachovia Corporation.  Wilson Decl., ¶ 7, Exhibit 5. In many instances, Derivium conducted transactions between the two internally, directly transferring proceeds of sales from Wachovia Securities to Wachovia Bank.  PAC ¶171. In addition, regardless of each entity's role in the Raifman's transaction, the participation of both Wachovia entities acting in cohorts with one another was a necessary component of the overall fraudulent Derivium program. *Id.* The Derivium scheme required a brokerage firm (Wachovia Securities) to conduct fraudulent sales of securities, and a bank (Wachovia Bank) to launder the

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
LEAVE TO FILE PROPOSED AMENDED COMPLAINT
Case No. C 11-02885 SBA

1  fraudulently gotten sales proceeds through, and could not have been carried out otherwise. *Id.*

2  The close nexus between both Wachovia entities' participation in the Derivium scheme allowed

3  and caused the underlying fraud to be concealed from the Raifman's. *Id.* Second, treating the

4  Bank and Securities entities separately would cause injustice because the actions of both parties

5  ultimately injured the Raifman's, while allowing either to be dismissed will prevent the

6  Raifman's from discovering what he is informed and believes to be the true roles of each entity.

7  PFAC ¶176.  Third, whether or not there was a single enterprise through which Wachovia

8  Securities and Wachovia Bank can both be liable is a question of fact, which would be improper

9  to determine at this juncture.  As a result, neither Wachovia Bank nor Wachovia Securities

10  should be dismissed as parties.

11  **7.  Conclusion**

12  The Plaintiffs respectfully request that the Court grant Plaintiffs leave to file their PAC.

13  Wachovia Securities marketed the Derivium 90% loan scheme and hedging strategy for

14  Derivium.  Judge Norton found the 90% loan transaction to be fraudulent.  Wachovia Bank

15  participated in the diversion of the Raifman's securities with Wachovia Securities knowing the

16  Raifmans would be harmed because of their participation.

17

18  Dated: November 18, 2011

19  Seattle, WA

20  /s/ Mark J. Wilson
    Mark J. Wilson
21  Cal. Bar No. 96985
    ISAACSON & WILSON, P.S
22  1200 Fifth Avenue, Suite 1900
    Seattle, WA 98101
23  Telephone:  (206) 448-1011
    Facsimile:   (206) 448-1022
24  Email: mjwilson@isaacsonwilson.com
    *Attorneys for Plaintiffs*

25

26

27

28

---

**14**
PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
LEAVE TO FILE PROPOSED AMENDED COMPLAINT
Case No. C 11-02885 SBA