UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GREGORY R. RAIFMAN and SUSAN RAIFMAN, et al., | Case No:  C 11-02885 SBA |
| Plaintiffs, | **ORDER GRANTING MOTION TO DIMSISS AND DENYING MOTION TO STRIKE** |
| vs. | Docket 153, 155 |
| WELLS FARGO ADVISORS, LLC, successor in interest to WACHOVIA SECURITIES, LLC; and WACHOVIA SECURITIES, LLC, | |
| Defendants. | |

The parties are presently before the Court on Defendant Wachovia Securities, LLC's ("Wachovia") motion to dismiss the third amended complaint ("TAC"), and Wachovia's motion to strike portions of the TAC.  Dkt. 153, 155.  Plaintiffs oppose the motions.  Dkt. 162, 163.  Having read and considered the papers filed in connection with these matters and being fully informed, the Court hereby GRANTS Wachovia's motion to dismiss, and DENIES Wachovia's motion to strike as MOOT, for the reasons stated below.  The Court, in its discretion, finds these matters suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

I.     **BACKGROUND**

A.     **90% Stock-Loan Program**

Plaintiffs allege that they lost millions of dollars because their securities broker Wachovia[1] worked together with Derivium Capital, LLC ("Derivium")[2] and its related

---

[1] In 2009, Wachovia merged with Wells Fargo Advisors, LLC and changed its name to Wells Fargo Advisors, LLC.  TAC ¶ 10.  Wells Fargo Advisors, LLC is the successor in interest to Wachovia, (collectively, "Wachovia").

entities to implement and execute an unlawful scheme, which was marketed to Plaintiffs as a financially desirable and tax beneficial "stock-loan" lending program.  TAC ¶¶ 19-20, 78, 83, 90, 96, 103.  The TAC alleges two claims for relief relating to Derivium's stock-loan program, known as the "90% Stock-Loan Program," whereby Derivium customers transferred publicly traded stocks to Derivium in exchange for cash in the form of nonrecourse "loans"[3] worth 90% of the market value of the stocks.  Id. ¶¶ 23, 26, 28.  Derivium kept the remaining 10% to fund its operating expenses or to invest in start-up companies it controlled.  Id. ¶ 26.  The loans were marketed to potential borrowers as a way to allow them to "monetize" their securities without having to pay taxes on their capital gains.  See United States v. Cathcart, 2010 WL 1048829, at *4 (N.D. Cal. 2010), adopted, 2010 WL 807444 (N.D. Cal. 2010).

The principal and interest on Derivium's stock loans were not due until maturity of the loans, TAC ¶ 28, after a term of at least three years.  See Def.'s RJN, Exh. A-1.  Upon maturity of a stock-loan, the borrower had the option of tendering principal and interest and recovering their collateral (i.e., their pledged stocks) or refinancing the transaction for an additional term.  See id., Exh. A.  Alternatively, because the loans were nonrecourse,[4] if the value of the stock pledged as collateral decreased during the term of the loan, the borrower could surrender the stock to Derivium in satisfaction of the loan with no further obligation.

Plaintiffs allege that Wachovia not only sold them stock as part of the unlawful

---

[2] Derivium was formerly known as First Security Capital, LLC.  TAC ¶ 23.  At all relevant times, Charles Cathcart, Yuri Debevc, and Scott Cathcart owned and controlled Derivium.  Id.

[3] For purposes of this Order, the Court will refer to the 90% stock-loan transactions as "loans."  However, the word "loan" is used only to describe the form of the transaction, not its substance.  Courts have held that the 90% stock-loan transactions at issue in this case constitute sales of securities for tax purposes, rather than bona fide loan transactions.  See e.g., Sollberger v. C.I.R., 691 F.3d 1119, 1121 (9th Cir. 2012); Raifman v. C.I.R., 2012 WL 3193934, at *6, *9 (T.C. 2012.)

[4] A "nonrecourse loan" is "[a] secured loan that allows the lender to attach only the collateral, not the borrowers' personal assets, if the loan is not repaid."  See Black's Law Dictionary (9th ed. 2009).

scheme, thereby receiving millions of dollars in commissions, but also solicited Plaintiffs to enter into stock loans and worked with Derivium to market the 90% Stock-Loan Program. TAC ¶ 20.   Specifically, Plaintiffs allege that the Loftus Group at Wachovia prepared marketing materials that were used to present the 90% Stock-Loan Program to Wachovia's customers and prospective clients.[5]  Id. ¶ 33.  George Gordon III ("Gordon"), the assistant manager of Wachovia's Richmond, Virginia branch, was responsible for opening accounts at Wachovia for hundreds of Derivium borrowers, including Plaintiffs.  Id. ¶ 36.  He also distributed marketing materials to potential borrowers and placed advertisements in Forbes magazine, which promoted the stock-loan program as a unique way to generate liquidity without having to actually sell stock.  Id.  The marketing materials distributed by Gordon outlined a specific five-step sequence of events that borrowers and Derivium were to follow in order to "implement" the loan:  (1) the borrower applies for the loan; (2), the borrower signs a Master Loan and Financing Agreement ("Master Agreement"); (3) the borrower transfers stock to a "special purpose account" with Derivium's "preferred broker" - i.e., Gordon at Wachovia; (4) Derivium and Gordon "hedge" the stock; and (5) the borrower receives the loan proceeds within 24 to 48 hours, i.e., 90% of the value of the stock pledged as collateral for the loan.  Id. ¶ 35.

Relying upon the marketing materials and the terms of their Master Agreements,[6] Plaintiffs followed the five-step sequence as directed by Wachovia and Derivium.  TAC ¶ 69.  Plaintiffs deposited stocks into Derivium brokerage accounts at Wachovia in Derivium's name and also in the names of First Security Capital, LLC ("First Security"), Derivium Capital, LLC ("Derivium Capital"), Bancroft Ventures Limited ("Bancroft"), WITCO Services (UK) Limited ("WITCO"), Optech Limited ("Optech"), or Spencer

---

[5] The manager of Wachovia's Richmond, Virginia branch, Walter Anderson ("Anderson"), was listed as a client in the marketing materials.  TAC ¶ 33.  Both Gordon and Anderson, among other Wachovia employees, actively promoted and marketed the 90% Stock-Loan Program.  Id. ¶ 34.

[6] Every borrower signed a Master Agreement and a Loan Schedule, which set forth additional terms such as the term of the loan and the amount of stock pledged as collateral. TAC ¶ 37.

Partners Ltd. ("Spencer Partners") (collectively, the "Offshore Lenders").[7]  Id. ¶¶ 28, 35, 69.  While Derivium represented to Plaintiffs that it would "hedge" their stocks during the term of their loans to protect the value of their stock using a confidential proprietary "hedging strategy," it did not do so.  Id. ¶¶ 19, 26-27, 73.  Instead, unbeknownst to Plaintiffs, Wachovia, "as the securities broker handling and executing the transactions," immediately sold all of Plaintiffs' pledged collateral and transferred the proceeds to one of Derivium's accounts at Wachovia.  Id. ¶¶ 25-26, 42,  71.  Derivium then used 90% of the sale proceeds, less commissions, to fund Plaintiffs' loans.  Id. ¶ 26, 71.  Thereafter, Derivium or one of the Offshore Lenders periodically provided Plaintiffs with account statements notifying them of the loan interest due, which led Plaintiffs to believe that their pledged collateral had not been immediately sold to fund their loans.  Id. ¶¶ 28, 70.

Plaintiffs allege that they were fraudulently induced by Wachovia to enter into their respective Master Agreements and Wachovia Account Agreements between 2000 and 2004.  TAC ¶ 19.  They assert that Wachovia knew that the terms of their Master Agreements were misleading and contained misrepresentations, including that the loans were nonrecourse to the borrower, recourse only against the stocks, all dividends would be received as cash payments against interest due, and that the loans would be funded upon receipt of the stocks and establishment of Derivium's hedging transaction.  Id.  Plaintiffs further assert that Wachovia knew that, contrary to the representations in the stock-loan marketing materials, their pledged collateral would immediately be sold rather than hedged. Id. ¶¶ 20 24-25 n. 1, 30-31, 73.  In addition, Plaintiffs allege that Wachovia knew that the immediate sale of their stocks did not constitute a "hedge"; was unauthorized by Plaintiffs; was done without Plaintiffs' knowledge or consent; was contrary to the representations in the stock-loan marketing materials, which were reviewed, approved, and prepared by Wachovia; and was in violation of the terms of Plaintiffs' Master Agreements and Loan

---

[7] All of the Deriviurn and Derivium related accounts at Wachovia were located at the Wachovia branch managed by Anderson and Gordon, including the accounts of the Derivium related offshore entities, Optech, Bancroft, WITCO, and Spencer Partners.  TAC ¶ 41.

Schedules.  Id. ¶¶ 72-74.

According to Plaintiffs, Wachovia worked together with Derivium to facilitate and execute the sale of their stock without their knowledge, authorization, or consent.  TAC ¶¶ 73-74.  Wachovia also failed to disclose to Plaintiffs that there was no proprietary hedging strategy that would enable Derivium to return Plaintiffs' pledged collateral at the end of the loan term, and that their collateral was sold immediately before the commencement of the loan term.  Id. ¶¶ 27, 32.

Between 1998 and 2002, Wachovia liquidated a total of $488,008,094 of Plaintiffs' and other borrowers' stocks pledged as collateral for Derivium's stock loans.  TAC ¶ 45.  When the borrowers' stock loans matured, Derivium was unable to return their pledged collateral as promised because the stock had been immediately sold to fund the loans.  Id. ¶ 51.  In December 2004, Wachovia closed all of Derivium's brokerage accounts and ceased any further account activities.  Id. ¶ 54.  On September 1, 2005, Derivium filed for bankruptcy protection.  Id. ¶ 55.  In October 2005, Forbes published an article, titled "Offshore Mystery," which described Derivium's 90% Stock-Loan Program and reported that the program was referred to as a "Ponzi scheme."  Def.'s RJN, Exh. Q.  The article also indicated, among other things, that Derivium was in bankruptcy and under investigation by the Internal Revenue Service, and that arbitrations and lawsuits had been filed against Derivium.  Id.

### B.   Plaintiffs' Loans

#### 1.   Gregory and Susan Raifman

Gregory and Susan Raifman (collectively, the "Raifmans") are a married couple.  TAC ¶ 1.  They learned about the 90% Stock-Loan Program from their financial adviser, Joe Ramos ("Ramos").  Id. ¶¶ 1, 77; Def.'s RJN, Exh. O at 3.  In 2003, the Raifmans opened a brokerage account at Wachovia and Gordon was assigned as their broker.  TAC ¶ 77.  Thereafter, the Raifmans entered into three stock loans.  Id. ¶ 78.  On August 5, 2003, they signed their first Master Agreement on behalf of the Raifman Family Recvocable Inter Vivos Trust in the loan amount of $1,260,335.52, representing 90% of the value of 320,000

ValueClick shares.  Id.  On July 6, 2004, they signed their second Master Agreement on behalf of their former wholly-owned company, Helicon Investments, Ltd., in the loan amount of $2,810,475.60, representing 90% of the value of 300,000 ValueClick shares.  Id. On November 15, 2004, the Raifmans signed their third Master Agreement on behalf of Gekko Holdings, LLC in the loan amount of $2,160,266.92, representing 90% of the value of 200,000 ValueClick shares.  Id.

The Raifmans' first Master Agreement states, in relevant part:

> The Client understands that by transferring custody of the Collateral to WITCO as agent for the Lender under terms of this Agreement and Schedule(s) A, the Client grants to the Lender and its agent, WITCO, the right and power, without the requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the Collateral during the Loan Term (as defined in Schedule(s) A).
>
> . . .
>
> WITCO and the Lender unconditionally agree to return to the Client, at the end of the Loan Term, the same Collateral received for such Loan, as such Collateral is listed and described in the associated Schedule A, so long as the Client has then satisfied in full all outstanding Loan obligations to the Lender, including the payment of interest accrued on the Loan.  If the Collateral is stock, the Collateral to be returned to the Client as per this paragraph shall reflect any and all stock splits, conversions, exchanges, mergers, or other dividends and distributions, except dividends paid on the Collateral that are to be credited toward interest due under the Loan to the Client, as provided in Schedule A.

Def.'s Request for Judicial Notice ("RJN"), Exh. A.

The Loan Schedule for the Raifmans' first loan provides for a loan term of three years.  Def.'s RJN, Exh. A-1.  The terms of the Raifmans' second and third Master Agreements are identical in all material respects to the terms of their first Master Agreement.  See id., Exhs. B, B-1, B-2, C, C-1.  The Loan Schedule for the Raifmans' second loan provides for a loan term of three years.  Id., Exh. B-2.  Although the loan term for the Raifmans' third Master Agreement is not disclosed in the record, it is undisputed that the majority of Derivium's 90% stock loans were for a term of three years.  See Isaacson Decl. ¶ 7, Dkt. 162-1.  All of the stock that the Raifmans pledged as collateral for their stock loans was immediately sold by Wachovia.  TAC ¶ 79.

### 2.      James Loomis

In 2002, James Loomis ("Loomis") opened an account at Wachovia and Robert Eddy ("Eddy") was assigned as his broker.  TAC ¶¶ 83-84.  Loomis entered into one stock loan.  Id. ¶ 84.  On March 26, 2003, Loomis signed a Master Agreement.  Def.'s RJN, Exh. E.  Shortly thereafter, all of his shares in "UPS FRN" were immediately sold by Wachovia. TAC ¶ 85.  The terms of Loomis' Master Agreement are identical in all material respects to the terms of the Raifmans' first Master Agreement.  Def.'s RJN, Exh. E.  The loan term for Loomis' stock-loan is not disclosed in the record.  However, Plaintiffs do not dispute that Loomis' loan matured in 2006.  In other words, the term of his stock-loan was three years.

### 3.      Edward and Lorraine Kurata

Edward and Lorraine Kurata (collectively, the "Kuratas") learned about Derivium's 90% Stock-Loan Program from their financial advisor.  TAC ¶ 89.  Thereafter, they entered into two stock loans and transferred shares of Foundry Networks into "Derivium's account at Wachovia."  Id. ¶¶ 89-90.  On April 19, 2000, the Kuratas signed their first Master Agreement with Derivium.  Id.  Their first loan was funded on April 20, 2000, in the amount of $4,638,653.94, representing 90% of the value of 63,313 shares of Foundry Network.  Id.  Their second loan was funded on June 13, 2000, in the amount of $2,766,065.62, representing 90% of the value of 27,700 shares of Foundry Network.  Id. All of the stock that the Kuratas' pledged as collateral for their stock loans was immediately sold by Wachovia.  Id. ¶ 92.  The terms of the Kuratas' first Master Agreement are identical in all material respects to the terms of the Raifmans' first Master Agreement.  Def.'s RJN, Exh. D.  The Loan Schedules for the Kuratas' stock loans provide for a three-year loan term.  Id., Exhs. D-1, D-2.

### 4.      Jeffrey Chou

In 2003, Jeffrey Chou ("Chou") opened an account at Wachovia.  TAC ¶ 96. Thereafter, he entered into three stock loans.  Id.  On November 28, 2003, Chou signed his first Master Agreement in the amount of $264,060, representing 90% of the value of 50,000 Brocade Communication Systems shares.  Id.  On December 8, 2003, he signed his second

Master Agreement in the amount of $397,973, representing 90% of the value of 50,000 McData Corp. shares.  Id.  On December 15, 2003, Chou signed his third Master Agreement in the amount of $319,474, representing 90% of the value of 40,000 McData Corp shares.  Id.  All of the stock that Chou pledged as collateral for his stock loans was immediately sold by Wachovia.  Id. ¶ 97.  The terms of Chou's first Master Agreement are identical in all material respects to the terms of the Raifmans' first Master Agreement.  Def.'s RJN, Exh. F.  While the loan term for Chou's stock loans is not disclosed in the record, Plaintiffs do not dispute that Chou's loans matured in 2006.

### 5.     Bruce Cardinal

Bruce Cardinal ("Cardinal") is the Trustee of the Robert J. Cardinal Grandchildren's Trust ("Grandchildren's Trust"), and of the Marion I. Cardinal Trust ("Marion Trust").  TAC ¶ 8.  He is also the Managing Member of Redbird Investment Group, LLC ("Redbird").  Id. ¶ 9.

Cardinal entered into five stock loans.  TAC ¶ 102.  He entered into three loans on behalf of the Grandchildren's Trust.  Id. ¶ 103.  The first loan was entered into on March 29, 2004, in the amount of $112,292, representing 90% of the value of 2,100 Walt Disney Company shares and 2,400 Albertsons, Inc. shares.  Id.  The second loan was entered into on March 29, 2004, in the amount of $146,016, representing 90% of the value of 3,200 Johnson & Johnson shares.  Id.  The third loan was entered into on April 2, 2004, in the amount of $163,200, representing 90% of the value of 3,000 PepsiCo shares.  Id.

Additionally, Cardinal entered into a stock-loan on behalf of the Marion Trust in the amount of $126,484.40, representing 90% of the value of 1,300 of The Southern Co. shares and 2,112 Exxon Mobile shares.  TAC ¶ 104.  Cardinal also entered into a stock-loan on behalf of Redbird in the amount of $98,008, representing 90% of the value of Amgen, Inc. shares.[8]  TAC ¶ 104.  All of the stock that Cardinal pledged as collateral for his stock loans was immediately sold by Wachovia.  TAC ¶ 107.

---

[8] The TAC does not identify the specific dates that Cardinal entered into the fourth and fifth stock loans.

1   Cardinal's Master Agreements are dated January 12, 2004, and are identical in all

2   material respects to the terms of the Raifmans' first Master Agreement.  See Def.'s RJN,

3   Exhs. I, I-1, J, K.  The loan term for each of Cardinal's loans was three years.  Id., Exhs. I-

4   2, I-3, I-4, J-2, K-2.

5   **II.**   **DISCUSSION**

6       **A.**   **Judicial Notice**

7       Wachovia filed three separate requests for judicial notice in which Wachovia

8   requests the Court take judicial notice of various court filings, numerous documents

9   referenced by the TAC (e.g., Master Agreements), and a Forbes Magazine article, titled

10  "Offshore Mystery."  Dkt. 154, 156, 170.  Plaintiffs do not oppose Wachovia's requests.

11      A court may take judicial notice of court filings and other matters of public record.

12  Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n. 6 (9th Cir. 2006).  A

13  court may also take judicial notice of documents on which the complaint "necessarily

14  relies" if:  (1) the complaint refers to the document; (2) the document is central to the

15  plaintiff's claim; and (3) no party questions the authenticity of the document.  U.S. v.

16  Corinthian Colleges, 655 F.3d 984, 999 (9th Cir. 2011).  "Courts may [also] take judicial

17  notice of publications introduced to 'indicate what was in the public realm at the time, not

18  whether the contents of those articles were in fact true.' "  Von Saher v. Norton Simon

19  Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir. 2010); accord Heliotrope Gen. Inc.

20  v. Ford Motor Co., 189 F.3d 971, 981 n. 118 (9th Cir. 1999) (taking judicial notice "that the

21  market was aware of the information contained in news articles submitted by the

22  defendants."); see also Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406, 425

23  (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior

24  lawsuits, or regulatory filings contained certain information, without regard to the truth of

25  their contents, in deciding whether so-called "storm warnings" were adequate to trigger

26  inquiry notice as well as other matters.") (emphasis in original).

27      Having reviewed Wachovia's unopposed requests for judicial notice, the Court finds

28  that it is appropriate to take judicial notice of the documents submitted by Wachovia.

Accordingly, Wachovia's requests for judicial notice are GRANTED.  The Court therefore takes judicial notice of the various court filings submitted by Wachovia as well as the documents submitted by Wachovia that are incorporated into the TAC by reference.  The Court also takes judicial notice of the Forbes Magazine article, titled "Offshore Mystery," for the limited purpose of demonstrating the information in the public realm at the time of the article.

### B.      Motion to Dismiss

In the instant motion, Wachovia contends that dismissal of the TAC is warranted for three reasons:  (1) Plaintiffs' claims are time-barred; (2) the TAC is an impermissible shotgun pleading; and (3) the TAC fails to plead a cognizable claim for relief.

### 1.      Legal Standard

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

In assessing the sufficiency of the pleadings, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007).  However, "the tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." Id. at 679.  Those facts must be sufficient to push the claims "across the line from conceivable to plausible." Id. at 683.  Ultimately, the allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (internal quotation marks and citation omitted).

Where a complaint or claim is dismissed, "[l]eave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts." Knappenberger v. City of Phoenix, 566 F.3d 936, 942 (9th Cir. 2009). Leave to amend is not required where permitting further amendment to the pleadings would be futile.  See Deveraturda v. Globe Aviation Sec. Servs., 454 F.3d 1043, 1049-1050 (9th Cir. 2006).

### 2.    Choice of Law

As a threshold matter, the parties dispute whether California or Virginia law applies. Wachovia contends that Virginia law applies, while Plaintiffs contend that California law applies.  In response to Plaintiffs' contention that California law applies, Wachovia asserts that Plaintiffs' choice of law arguments are "irrelevant" because the claims in the TAC are barred under both Virginia and California law.

Virginia has a two-year statute of limitations for negligence and fraud claims.  Va. Code Ann. § 8.01-243.  There is no discovery rule in Virginia for negligence claims, and as such, the statute of limitations begins to run on the date of the injury.  Andersson Gustafsson Advokatbyra KB v. eSCRUB Systems, Inc., 2011 WL 3954878, at *2 (E.D. Va. 2011).  Virginia follows "the general rule that the applicable period of limitation begins to run from the moment the cause of action arises rather than from the time of discovery of injury or damage, and . . . that [any] difficulty in ascertaining the existence of a cause of action is irrelevant." Comptroller of Virginia ex rel. Virginia Military Institute v. King, 217

1   Va. 751, 759 (1977).  However, "[i]n actions for fraud" a claim accrues under Virginia law

2   when such fraud is "discovered or by the exercise of due diligence reasonably should have

3   been discovered."  Va. Code Ann. § 8.01-249; see also Dunn v. City of Williamsburg, 35

4   Va. Cir. 420, at *6 (1995).

5          California has a two-year statute of limitations for claims alleging negligent

6   performance of professional services.  See Cal. Code Civ. Proc. § 339(a); Hydro–Mill Co.

7   Inc. v. Hayward, Tilton & Rolapp Ins. Assocs., 115 Cal.App.4th 1145, 1159 (2004)

8   (applying two-year statute of limitations to professional negligence claim).  California has a

9   three-year statute of limitations for fraud claims.  Cal. Code Civ. Proc. § 338(d).[9]  Under

10   California law, a plaintiff must bring a claim within the limitations period after accrual of

11   the claim.  Norgart v. Upjohn Co., 21 Cal.4th 383, 397 (1999).  Generally speaking, a claim

12   accrues at "the time when the [claim] is complete with all of its elements."  Id.  However,

13   an important exception to the general rule of accrual is the delayed "discovery rule," which

14   "postpones accrual of a [claim] until the plaintiff discovers, or has reason to discover, the

15   [claim]."  Id.

16          Here, because Plaintiffs' claims are untimely under California and Virginia law, the

17   Court will not decide the choice of law issue.  As discussed below, even under California's

18   more generous rules, Plaintiffs' claims are time-barred.

19                    3.          **Timeliness of Plaintiffs' Claims**

20          Plaintiffs' claims are predicated on Wachovia's immediate sale of the stock they

21   pledged as collateral for their stock loans and Wachovia's failure to disclose to Plaintiffs

22   that there was no "hedging strategy" and that it was foreseeable that Plaintiffs would suffer

23   a loss as a result of the immediate sale of their stock.  According to Plaintiffs, they have

24   suffered monetary damages as a result of Wachovia's failure to hedge their collateral.

25   Because the Raifmans did not commence the instant action until April 2011 and the other

26

27          [9] Section 338(d) incorporates the "discovery rule"; providing that a fraud claim "is
    not deemed to have accrued until the discovery, by the aggrieved party, of the facts
28   constituting the fraud or mistake."  See Brandon G. v. Gray, 111 Cal.App.4th 29, 35 (2003).

named Plaintiffs did not join this action until March 2013, long after their injury occurred, Plaintiffs' claims are time-barred on the face of the TAC.  As such, dismissal is appropriate unless Plaintiffs have pled sufficient facts to establish application of the delayed discovery rule, the doctrine of equitable tolling, or the doctrine of equitable estoppel.

### a.    Discovery Rule

Plaintiffs contend that their claims are timely because they could not have reasonably discovered "viable claims against Wachovia until after November 2010."  Pl.'s Opp. at 5; see TAC ¶¶ 56-62.  According to Plaintiffs, the "true nature" of Wachovia's involvement in the 90% Stock-Loan Program became discoverable for the first time as a result of a document filed on November 15, 2010 in Derivium's bankruptcy action, which referenced a letter from Derivium to Wachovia dated May 21, 1998.[10]  Id. ¶ 57.  Plaintiffs claim that this letter, written by Charles Cathcart and addressed to Gordon (hereafter, "Cathcart Letter"), reveals an agreement between Derivium and Wachovia in which Wachovia agreed to be responsible for the hedging transactions and agreed to keep confidential all information regarding such transactions from borrowers.  Id. ¶ 58, Exh. A. The Court construes Plaintiffs' argument as contending that their claims against Wachovia are timely because they did not accrue until sometime after November 2010 under the delayed discovery rule.

Under the delayed discovery rule, the accrual of an action may be postponed and the running of the limitations period tolled "until the plaintiff discovers, or has reason to discover, the cause of action."  Fox v. Ethicon Endo–Surgery, Inc., 35 Cal.4th 797, 807 (2005).  A plaintiff has reason to discover a cause of action when he "has reason at least to

---

[10] The Court notes that Plaintiffs' contention is inconsistent with the allegations in the original complaint.  The original complaint alleges that "[t]he Raifmans did not know, and with the exercise of reasonable diligence could not have discovered until *March 2010*, that Wachovia was knowingly and intentionally assisting Derivium in fraudulently violating the terms of the [Master Agreements]."  Compl. ¶ 74 (emphasis added).  Plaintiffs omitted this allegation in the TAC and failed to offer a persuasive explanation for the omission.  The allegations in the original complaint undermine Plaintiffs' claim that they could not have discovered Wachovia's wrongdoing until they discovered the Cathcart Letter.

1   suspect a factual basis for its elements."  <u>Id.</u>  The term "elements," does not require a

2   court's hypertechnical inquiry into suspicions regarding each element of a claim, but

3   instead refers to the " 'generic' elements of wrongdoing, causation, and harm."  <u>Id.</u>  As

4   such, a court looks to whether the plaintiff has reason to "at least suspect that a type of

5   wrongdoing has injured them."  <u>Id.</u>

6       The statute of limitations begins to run when the plaintiff has information of

7   circumstances which would put a reasonable person on inquiry.  <u>Jolly v. Eli Lilly & Co.</u>, 44

8   Cal.3d 1103, 1110-1111 (1988) ("The statute of limitations begins to run when the plaintiff

9   suspects or should suspect that her injury was caused by wrongdoing.");  <u>Fox</u>, 35 Cal.4th

10  797, 807 ("The discovery rule only delays accrual until the plaintiff has, or should have,

11  inquiry notice of the cause of action.").  A plaintiff need not be aware of the specific facts

12  necessary to establish a claim since they can be developed in pretrial discovery.  <u>Id.</u> at

13  <u>Jolly</u>, 44 Cal.3d at 1111.  Nor must a plaintiff be aware of the exact identity of the

14  wrongdoer.  <u>Kline v. Turner</u>, 87 Cal.App.4th 1369, 1375 (2001) ("a cause of action accrues

15  when the wrong is suspected even if its exact cause or the identity of the wrongdoer is

16  unknown");  <u>see</u> <u>Jolly</u>, 44 Cal.3d at 1112 n. 8 (noting that it is well established that "the

17  ignorance of the legal significance of known facts or the identity of the wrongdoer will not

18  delay the running of the statute").

19      Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue,

20  he must decide whether to file suit or sit on his rights.  So long as a suspicion exists, it is

21  clear that the plaintiff must go find the facts; he cannot wait for the facts to find him.  <u>Jolly</u>,

22  44 Cal.3d at 1111.  Under the discovery rule, the plaintiff is charged with presumptive

23  knowledge of an injury if he has information of circumstances to put a reasonable person

24  on inquiry, or if he has the opportunity to obtain knowledge from sources open to his

25  investigation.  <u>Fox</u>, 35 Cal.4th at 808.  In other words, a plaintiff is required to conduct a

26  reasonable investigation after becoming aware of an injury, and is charged with knowledge

27  of the information that would have been revealed by such an investigation.  <u>Fox</u>, 35 Cal.4th

28  at 807-808.

To invoke the discovery rule, a plaintiff must specifically plead facts showing: "(1) the time and manner of discovery; *and* (2) the inability to have made earlier discovery despite reasonable diligence. Fox, 35 Cal.4th at 808 (emphasis in original quotation marks omitted). The plaintiff bears the burden to "show diligence" and "conclusory allegations" will not withstand dismissal. Id.

### i.     Accrual of the Raifmans' Claims

The Raifmans opened a brokerage account with Wachovia in 2003. TAC ¶ 77. At that time, Gordon was assigned as their securities broker. Id. ¶ 69. On August 5, 2003, the Raifmans signed their first Master Agreement. Id. ¶ 78. It had a three-year loan term. Def.'s RJN, Exh. A-1. On August 10, 2006, the Raifmans completed a form electing to renew or refinance their first loan for another three-year term. Def.'s RJN, Exh. O at 12.[11] After they did not receive a response from their "lender" Optech, and after Optech defaulted on their first loan, Carin Levine ("Levine"), the general counsel for the Raifmans' investment adviser, sent Optech a letter demanding the return of the 320,000 shares of ValueClick stock that the Raifmans had pledged as collateral for their first loan. Id. The Raifmans, again, received no response from Optech. Id. On November 21, 2006, Levine initiated arbitration proceedings against Optech on behalf of the Raifmans. Id.

Before the end of 2006, the Raifmans commenced an investigation into the principals of Optech, WITCO, Derivium, and "the whole 90% Stock Loan Program." Def.'s RJN, Exh. O at 12. During that investigation, the Raifmans discovered that Derivium had defaulted on numerous 90% stock loans, other borrowers had filed lawsuits, and that Derivium had filed for bankruptcy in 2005. Id. at 13. Additionally, during the course of their investigation, the Raifmans learned that the California Corporations Commission had filed a lawsuit against Derivium seeking to enjoin Derivium from engaging in the 90% Stock-Loan Program, and that, in most cases, Derivium immediately sold the borrowers' collateral in order to fund their stock loans. Id. After learning these

---

[11] Exhibit O is a declaration filed by Gregory Raifman in an action before the United States Tax Court.

facts in late 2006, the Raifmans reported to the Federal Bureau of Investigation that Derivium had stolen their ValueClick stock.  Id.  In September 2007, the Raifmans filed an arbitration demand against their financial advisers, Ramos and Private Consulting Group ("PCG"), for breach of contract, breach of fiduciary duty, professional negligence, and constructive fraud in connection with the 90% Stock-Loan Program.[12]  Id.

Based on Wachovia's involvement in the 90% Stock-Loan Program as alleged in the TAC,[13] the Court finds that the Raifmans had reason to suspect wrongdoing regarding the program in late 2006, and therefore had an affirmative obligation to discover the facts supporting their claims against Wachovia and to file a complaint within the applicable limitations period.  By late 2006, sufficient indicia of fraud existed to place the Raifmans on inquiry notice that they had been harmed by the 90% Stock-Loan Program.  Once the Raifmans' collateral for their first stock-loan was not returned, they had a reasonable basis to question the validity of the representations made by Derivium and Wachovia concerning the 90% Stock-Loan Program.  At that time, they had reason to suspect at least one fraudulent act; namely, that the ValueClick stock they pledged as collateral for their first stock loan was immediately sold by Wachovia, not hedged, without their permission purportedly in violation of their Wachovia Account Agreement and their Master

---

[12] While omitted from the TAC, the original complaint alleges that "[o]n September 23, 2009, the arbitrator found . . . Ramos and PCM . . . liable for breach of fiduciary duty, violation of the California Securities Act, negligent misrepresentation, and professional negligence, and constructive fraud in connection with the 90% Loan transactions.  The Raifmans obtained a final award of $13,907,403 against Ramos and PCG, of which $6.375 million was for damages arising out of the 90% Loan transactions."  Compl. ¶ 69, Dkt. 1.

[13] The TAC alleges, among other things, that Wachovia solicited the Raifmans to enter into the stock loans and to open an account at Wachovia, worked with Derivium to market the 90% Stock-Loan Program, and managed and supervised the Raifmans' Derivium transactions.  TAC ¶ 20.  The TAC also alleges that the Raifmans relied on the marketing materials prepared by Wachovia in entering into their stock loans.  Id. ¶¶ 33, 35, 69.  The marketing materials expressly provide that borrowers such as the Raifmans must transfer stock to a "special purpose account" at Wachovia with Derivium's "preferred broker" (i.e., Gordon), and that Derivium and Gordon would "hedge" the stock.  Id. ¶¶ 33.  According to Gregory Raifman, between August 29, 2003 and September 4, 2003, he was specifically instructed by Derivium and Gordon to open an account at Wachovia for the purpose of entering into a stock-loan, which he did.  Def.'s RJN, Exh. P at 8.

Agreement.[14]  See Brandon G., 111 Cal.App.4th at 35 (A plaintiff is on inquiry notice of its fraud claims when he "learns, or at least is put on notice, that a representation [is] false."). When the Raifmans had a suspicion of wrongdoing in late 2006, they were required to conduct a reasonable investigation of all potential causes of their injury.

The TAC does not allege specific facts showing that, despite diligent investigation of the circumstances of their injury, the Raifmans could not have reasonably discovered facts supporting their claims against Wachovia within the applicable limitations periods.  While the TAC alleges that the Raifmans could not have learned of Wachovia's wrongdoing in connection with the 90% Stock-Loan Program until Plaintiffs' counsel discovered the Cathcart Letter in late 2010,[15] it is silent regarding the Raifmans' investigation into the causes of their injury.  Plaintiffs provide no explanation for why the TAC omits the facts discussed above regarding the Raifmans' investigation into the 90% Stock-Loan Program in late 2006.  In any event, the allegations in the TAC are clearly insufficient to delay accrual of the Raifmans' claims under the delayed discovery rule.  The TAC does not allege specific facts showing that the Raifmans were unable to have "made earlier discovery [of their claims against Wachovia] despite reasonable diligence."  See Landow v. Wachovia Securities, LLC,--- F.Supp.2d ----, 2013 WL 4432383, at *18 (E.D.N.Y. 2013) (finding that investor's claims against Wachovia arising out of the 90% Stock-Loan Program were untimely; noting that had the plaintiff engaged in "the most minimal of inquiries upon learning that the IRS viewed his loans under the 90% Loan Program as sales of his securities in July 2007, he would have discovered not only that Derivium had filed for bankruptcy, but also that since as early as April 2003, no less than eight (8) actions relating

---

[14] The TAC alleges that the Raifmans' Wachovia account application did not authorize Wachovia to sell any of their stock, and that they never authorized Wachovia to do so.  TAC ¶ 6

[15] Contrary to Plaintiffs' contention, the Cathcart Letter does not reveal a confidential agreement between Wachovia and Derivium.  Rather, the letter, written by Charles Cathcart on behalf of Derivium, simply provides Gordon with background information about Derivium and its 90% Stock-Loan Program.  TAC, Exh. A.  The letter specifically outlines two alternative processes for closing a loan under the program.  Id. The letter does not evidence a "secret" agreement on the part of Derivium and Wachovia.

to the 90% Loan Program had been commenced, two (2) of which . . . asserted fraud-based claims against Wachovia similar to those asserted by plaintiff"); In re Derivium Capital LLC, 716 F.3d 355, 359, n. 3 (4th Cir. 2013) (noting that, in August 2007, Derivium's trustee in the bankruptcy action filed a complaint against Wachovia, alleging nine tort claim, including aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and aiding and abetting fraudulent conveyance).

In sum, the Court concludes that the statute of limitations began to run on the Raifmans' claims in late 2006. At that time, the Raifmans had information which would put a reasonable person on inquiry of fraud to trigger their obligation to investigate all potential causes of that wrongdoing and to timely file suit. Because the Raifmans failed to do so, their claims are time-barred absent application of the doctrine of equitable tolling or the doctrine of equitable estoppel.

### ii.    Accrual of the Recently Added Plaintiffs' Claims

In March 2013, a second amended complaint was filed, adding as named Plaintiffs the Kuratas, Loomis, Chou, and Cardinal (collectively, the "recently added Plaintiffs"). See Dkt. 131. The recently added Plaintiffs allege the same claims as the Raifmans predicated on the same wrongdoing. See TAC. They also allege the same injury: money damages caused by Wachovia's failure to hedge their collateral. Id.

It is undisputed that the recently added Plaintiffs' loans matured in 2003, 2006 and 2007, respectively. Like the Raifmans, upon the maturity of their loans and the failure of Derivium or one of the Offshore Lenders to return their pledged collateral as provided in their Master Agreements, the recently added Plaintiffs were on inquiry notice that they had been injured by Derivium's 90% Stock-Loan Program. At that time, they had reason to suspect at least one fraudulent act; namely, that their pledged collateral was sold by Wachovia, not hedged, purportedly in violation of their Wachovia Account Agreements and Master Agreements. See Brandon G., 111 Cal.App.4th at 35. Thus, by no later than 2007, all of the recently added Plaintiffs had a factual basis to suspect wrongdoing (i.e., inquiry notice of wrongdoing) sufficient to trigger a duty to conduct a reasonable

investigation of all potential causes of that wrongdoing and to file an action within the applicable limitations period.  Indeed, as discussed above, given Wachovia's involvement in the 90% Stock-Loan Program, the recently added Plaintiffs had a basis to suspect that Wachovia played a role in their injury caused by the program.

While the TAC alleges that Plaintiffs' counsel discovered the Cathcart Letter in November 2010, it does not contain any facts showing that the recently added Plaintiffs conducted an investigation into the causes of their injury.[16]  The TAC is silent as to their exercise of due diligence in investigating the causes of their injury.  The TAC does not allege any facts showing that the recently added Plaintiffs were unable to have made earlier discovery of Wachovia's involvement in the alleged wrongdoing giving rise to this action despite reasonable diligence.  Indeed, a reasonable electronic search within the limitations period would have revealed other lawsuits alleging that Wachovia engaged in fraud in connection with the 90% Stock-Loan Program.  See Landow,--- F.Supp.2d ----, 2013 WL 4432383, at *18; In re Derivium Capital LLC, 716 F.3d at 359, n. 3.  Accordingly, because the recently added Plaintiff joined this action in March 2013, more than three years after their claims accrued, their claims are time-barred absent application of the doctrine of equitable tolling or the doctrine of equitable estoppel.

### b.    Equitable Tolling/Equitable Estoppel

Implicitly recognizing that their claims are time-barred, Plaintiffs attempt to avoid the statute of limitations bar by invoking the doctrines of equitable tolling and equitable estoppel.  Without elaboration or citation to specific portions of the 138-paragraph TAC, the Plaintiffs contend they have "alleged equitable tolling sufficient to raise a factual dispute as to when, and under what circumstances, it was reasonable for [them] to learn of Wachovia's secret involvement with Derivium."  Pl.'s Opp. at 5.  They vaguely assert that "Wachovia and its counsel also know all too well the many attempts made by Plaintiffs' counsel to investigate and discover Wachovia's involvement, and the well-orchestrated

---

[16] The allegations in the TAC regarding the discovery of Wachovia's wrongful conduct are the same for all the Plaintiffs.

1  actions of Wachovia and its counsel in repeatedly and consistently failing to produce

2  documents, moving for protective orders, seeking confidentiality orders, and filing

3  documents under seal." Id. Plaintiffs also assert, without explanation, that "Wachovia has

4  blocked significant efforts by any reasonable plaintiff to discover Wachovia's knowledge

5  and involvement in Derivium's Ponzi scheme," as "detailed in the Isaacson Declaration."

6  Id. at 6. According to Plaintiffs, "[t]hat conduct presents a classic application of the

7  doctrine of equitable estoppel." Id. at 7.

8       The Court notes, as a threshold matter, there are two separate but related equitable

9  doctrines. Lantzy v. Centex Homes, 31 Cal.4th 363, 383 (2003). Tolling, "strictly

10 speaking," is concerned with the point at which the limitations period begins to run and

11 with the circumstances in which the running of the limitations period may be suspended.

12 Id. Equitable estoppel, however, comes into play only after the limitations period has run

13 and addresses the circumstances in which a party will be estopped from asserting the statute

14 of limitations as a defense to an admittedly untimely action because his conduct has

15 induced another into forbearing suit within the applicable limitations period. Id. For a

16 defendant to be equitably estopped from asserting a statute of limitations defense, the

17 plaintiff must be "directly prevented . . . from filing [a] suit on time." Id. at 835.

18      Here, Plaintiffs' equitable tolling and equitable estoppel arguments are predicated on

19 Wachovia's fraud in concealing facts that would have allowed them to discover

20 Wachovia's wrongdoing in connection with the 90% Stock-Loan Program. According to

21 Plaintiffs, they were only able to "reasonably discover the true nature of [Wachovia's]

22 involvement and the actions related to their accounts . . . in late 2010" due to

23 "[Wachovia's] prior failures to disclose and their concealment of their active participation

24 in the alleged hedging transactions of Plaintiffs' . . . securities. . . ." TAC ¶ 56.

25      "A close cousin of the [delayed] discovery rule is the "well accepted principle . . . of

26 fraudulent concealment." Bernson v. Browning-Ferris Indus., 7 Cal.4th 926, 931 (1994).

27 A defendant's fraud in concealing a cause of action against him tolls the applicable statute

28 of limitations, but only for that period during which the claim is undiscovered by plaintiff

1    or until such time as plaintiff, by the exercise of reasonable diligence, should have

2    discovered it.  Id.  The rationale for this rule is that a culpable defendant should be estopped

3    from profiting by his own wrong to the extent that it hindered an "otherwise diligent"

4    plaintiff in discovering his cause of action.  Id.; see also Grisham v. Philip Morris U.S.A.,

5    Inc., 40 Cal.4th 623, 637 (2007) (Tolling due to fraudulent concealment "will last as long

6    as a plaintiff's reliance on the misrepresentations is reasonable.").

7         "When a plaintiff relies on a theory of fraudulent concealment . . . to save a cause of

8    action that otherwise appears on its face to be time-barred, he or she must specifically plead

9    facts which, if proved, would support the theory."  Mills v. Forestex Co., 108 Cal.App.4th

10   625, 641 (2003).  "In order to establish fraudulent concealment, the complaint must show:

11   (1) when the fraud was discovered; (2) the circumstances under which it was discovered;

12   and (3) that the plaintiff was not at fault for failing to discover it or had no actual or

13   presumptive knowledge of facts sufficient to put him on inquiry."  Id.  "In urging lack of

14   means of obtaining knowledge, it must be shown that in the exercise of reasonable

15   diligence the facts could not have been discovered at an earlier date. . . ."  Baker v. Beech

16   Aircraft Corp., 39 Cal.App.3d 315, 321 (1974) (quotation marks and citations omitted).

17        The Court need not determine whether Plaintiffs have sufficiently alleged fraudulent

18   concealment by Wachovia, because whether they have or not,[17] they are not entitled to

19   equitable tolling or equitable estoppel based on such concealment.  "The fraudulent

20   concealment doctrine does not come into play, whatever the lengths to which a defendant

21   has gone to conceal the wrongs, *if a plaintiff is on notice of a potential claim*."  Snapp &

22   Assoc. Ins. Servs., Inc. v. Malcolm Bruce Burlingame, 96 Cal.App.4th 884, 890-891 (2002)

23   (emphasis added and quotation marks omitted).  That is, it does not come into play where a

24   plaintiff's claim has accrued because he or she has a "*suspicion* of wrongdoing, coupled

25   with a knowledge of the harm and its cause. . . ."  Id. at 891 (emphasis in original) (citing

26

27        [17] The Court notes that Plaintiffs' conclusory arguments regarding equitable tolling
     and equitable estoppel do not demonstrate that either doctrine is applicable.  Moreover, a
28   review of the TAC reveals that Plaintiffs have failed to plead sufficient facts to invoke
     either the doctrine of equitable tolling or the doctrine of equitable estoppel.

Jolly, 44 Cal.3d at 1112 (1988)).

Here, the Court has already determined that the Plaintiffs claims accrued by no later than 2007 based on their suspicion of wrongdoing regarding the 90% Stock-Loan Program. Plaintiffs had knowledge of facts sufficient to put them on inquiry notice of wrongdoing when their stock loans matured and their pledged collateral was not returned.  As such, they are not entitled to equitably toll the limitations period until late 2010 based on any fraudulent concealment by Wachovia.  Nor is Wachovia estopped from asserting a statute of limitations defense.

### c.   Conclusion

As set forth above, Plaintiffs' claims against Wachovia were not filed within the applicable limitations periods.  Because Plaintiffs have already amended their complaint three times since Wachovia moved to dismiss the complaint on statute of limitations grounds in July 2011, and because they do not argue, and it does not appear,[18] that they could plead additional facts justifying application of the delayed discovery rule, the doctrine of equitable tolling, or the doctrine of equitable estoppel, the Court GRANTS Wachovia's motion to dismiss without leave to amend.[19]  Plaintiffs' claims are barred by the statute of limitations and any amendments to the TAC would be futile.  See Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1298 (9th Cir. 1998) ("Although there is a general rule that parties are allowed to amend their pleadings, it does not extend to cases in which any amendment would be an exercise in futility, or where the amended complaint would also be subject to dismissal. . . .").

### C.   Motion to Strike

Wachovia moves to strike certain portions of TAC.  However, because the Court has

---

[18] A review of the Isaacson declaration submitted by Plaintiffs in opposition to the instant motion reveals that Plaintiffs' equitable estoppel and equitable tolling theories are predicated on Wachovia's efforts to conceal its wrongdoing regarding the 90% Stock-Loan Program.  Isaacson Decl. ¶¶ 2-6.  Nothing in this declaration suggests that the TAC could be amended to set forth allegations giving rise to equitable estoppel or equitable tolling.

[19] In light of the Court's determination that Plaintiffs' claims are time-barred, the Court will not address Wachovia's alternative arguments for dismissal.

dismissed the TAC without leave to amend, Wachovia's motion to strike is DENIED as MOOT.

**III.**     **CONCLUSION**

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1.     Wachovia's motion to dismiss is GRANTED without leave to amend.

2.     Wachovia's motion to strike is DENIED as MOOT.

3.     The Clerk shall close the file and terminate all pending matters.

IT IS SO ORDERED.

Dated:  March 31, 2014

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge